UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
 UNITED STATES OF AMERICA,

        v.

                                                             Indictment No. 1:23-cr-024

SHAKEEM RANKIN,

            Defendant.
------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SHAKEEM RANKIN'S RESPONSE TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION TO SUPPRESS

Roger Victor Archibald
***Attorney for Shakeem Rankin***
26 Court Street Suite 711
Brooklyn, New York 11242
(718) 237-1111
brooklynatty@hotmail.com

January 11, 2024

TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

PRELIMINARY STATEMENT............................................................................................1

ARGUMENT:

I. GIVEN THE FACTUAL CONFLICTS OVER THE TIME OF THEIR ENTRY, INCLUDING INCONSISTENCIES IN THE GOVERNMENT'S OWN UNSWORN ACCOUNTS, THE COURT SHOULD ORDER A HEARING TO DETERMINE WHETHER THE AGENTS' ENTRY WAS WITHIN THE TERMS OF THEIR WARRANT.

    A. The Parties Respective Evidentiary Burdens When Suppression Is Sought..................................................................................................................1

    B. To Meet Its Evidentiary Burden, A Party Must Tender Actual Evidence.......2

    C. Given The Internal Inconsistencies In The Government's Own Potential Evidence, The Court Should Order A Hearing To Resolve The Factual Dispute Over The Time Of The Agents' Entry....................................................3

II. WHERE AGENTS FAILED TO ISSUE MIRANDA WARNINGS AND REFUSED TO CEASE THEIR QUESTIONING AFTER MR. RANKIN STATED THAT HE WOULD RATHER NOT SPEAK WITH THEM, HIS STATEMENTS WERE CUSTODIAL AND COERCED AND MUST BE SUPPRESSED.................................................................................................5

    A. The Standard For Determining Whether An Interrogation Is Custodial...........5

    B. Where, In Making Its Custody Determination, A Court Must Consider "All The Circumstances," There Is Enough Uncertainty Here About Some Of Them To Warrant A Hearing..................................................................9

CONCLUSION.......................................................................................................................10

## TABLE OF AUTHORITIES

**SUPREME COURT CASES**

Berkemer v. McCarty, 468 U.S. 420 (1984)..............................................................5

Miranda v. Arizona, 384 U.S. 436 (1966)................................................................5

Rhode Island v. Innis, 446 U.S. 291 (1980).............................................................5


**OTHER FEDERAL CASES**

In re Terrorist Bombings of U.S. Embassies in East Africa,
552 F.3d 157 (2d Cir. 2008).....................................................................................2

United States v. Arboleda, 633 F.2d 985 (2d Cir. 1980)..........................................1

United States v. Craighead, 539 F.3d 1073 (9th Cir. 2008)...................................10

United States v. Davis, 2016 WL 953239 (D. Nevada 2016)...................................3

United States v. Familetti, 878 F.3d 53, 60-62 (2d Cir. 2017)...............................10

United States v. Faux, 828 F.3d 130 (2d Cir. 2016)............................................5-6, 9

United States v. Harun, 232 F. Supp. 3d 282 (E.D.N.Y. 2017)................................2

United States v. Messalas, No. 17-CR-339 (RRM), 2020 WL 4003604
(E.D.N.Y. July 14, 2020)..........................................................................................3

United States v. Pena, 961 F.2d 333, 339 (2d Cir.1992).........................................2

United States v. Sanders, 2021 WL 2843108 (W.D.N.Y. 2021)..............................2

United States v. Trainor, 277 F.Supp.2d 1278 (S.D. Florida 2003).........................2

United States v. Walker, 2019 WL 1876873 (E.D.N.Y. 2019).................................2

OTHER AUTHORITY

Gary Langer, *Confidence in police practices drops to a new low: POLL Just 39% are confident that the police are trained to avoid excessive force.* (February 3, 2023, 6:09 AM) (https://abcnews.go.com/Politics/confidence-police-practices-drops-new-low-poll/story?id=96858308)..........................................................................

M.C. Brown & Camille Lloyd, *Black Americans Less Confident, Satisfied With Local Police*, Social & Policy Issues (September 18, 2023). (https://news.gallup.com/poll/511064/black-americans-less-confident-satisfied-local-police.aspx)................................................

Laura Santhanam, *Two-thirds Of Black Americans Don't Trust The Police To Treat Them Equally. Most White People Do* (June 5, 2020) (https://www.pbs.org/newshour/politics/two-thirds-of-black-americans-dont-trust-the-police-to-treat-them-equally-most-white-americans-do).....................

## **PRELIMINARY STATEMENT**

This Memorandum of Law is submitted on behalf of defendant SHAKEEM RANKIN in response to the Government's unsworn Opposition to his motion seeking suppression (1) of the fruit of the search of the Rankin family home at 799 Pine Street because: (I) executed well before 6 a.m., the warrant authorizing a daytime search was executed illegally, and (A) as those of an unauthorized intrusion, all its fruits were poisoned; or (II) induced in the absence of *Miranda* warnings and against his assertion that he preferred not to be questioned, Mr. Rankin's statements were the involuntary product of coercive questioning. Because, *inter alia*, the Government has proffered no sworn statements controverting the defense's claims, the Court should grant Mr. Rankin's motion without a hearing, or alternatively, hold a hearing at which the knowledgeable agents can explain their actions.

## ARGUMENT

### POINT

GIVEN THE FACTUAL CONFLICTS OVER THE TIME OF THEIR ENTRY, INCLUDING INCONSISTENCIES IN THE GOVERNMENT'S OWN UNSWORN ACCOUNTS, THE COURT SHOULD ORDER A HEARING TO DETERMINE WHETHER AGENTS' ENTRY WAS WITHIN THE TERMS OF THEIR WARRANT.

A.  The Parties Respective Evidentiary Burdens When Suppression Is Sought.

The burdens of production and persuasion in a suppression hearing generally rest upon the movant. United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980). A defendant moving for the suppression of evidence seized following a search must supports their motion with "moving papers [that] are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question," United States v. Pena, 961 F.2d 333, 339 (2d Cir.1992), including an affidavit of someone alleging personal knowledge of the relevant facts. "[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question," In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 157, 165 (2d Cir.2008); United States v. Harun, 232 F. Supp. 3d 282, 285 (E.D.N.Y. 2017)(where his papers, viewed in the context of the Government's response, demonstrate "a contested issue of material fact," a defendant is entitled to an evidentiary hearing).

B.  To Meet Its Evidentiary Burdens, A Party Must Tender Actual Evidence.

"Once a defendant establishes a basis for his motion, the burden shifts to the government to prove, by a preponderance of the evidence, the legality of its officers' actions." United States v.

Sanders, 2021 WL 2843108 at 4 (W.D.N.Y. 2021). To meet the preponderance of evidence standard, the Government must place some actual evidence before the Court. See United States v. Trainor, 277 F.Supp.2d 1278, 1286 (S.D. Florida 2003) ("for a judge to make the requisite § 3292(a)(1) findings by a "preponderance of the evidence," he must be presented with evidence of some sort. That means that the government's motion (assuming it has the necessary factual information) must be sworn or verified, or must be accompanied by affidavits, declarations, exhibits, or other materials of evidentiary value.") Simply put, if a judge is going to make factual findings by a "preponderance of the evidence," then evidence he must have. Id. "[A]n unsworn proffer of facts in an application or motion will not do." Id. See also United States v. Walker, 2019 WL 1876873 at 1 n.1 (E.D.N.Y. 2019)(where "motion papers include various factual representations that are not supported by any admissible evidence in the record," "failure to provide admissible evidence in support of the factual allegations in his briefs is a sufficient reason to exclude, or at the very least, discount such allegations.")

C. Given The Internal Inconsistencies In The Government's Own Potential Evidence, The Court Should Order A Hearing To Resolve The Factual Dipsute Over The Time Of The Agents' Entry.

Here, the physical evidence that the Government could introduce at a hearing, photographs supported by metadata, conflicts not only with allegations in the sworn affidavit of Mr. Rankin's mother, Jem Hazle Rankin, see Jem Rankin November 24, 2023 Affidavit at ¶¶ 7 but also with *it's own* unsworn allegations disputing the plain meaning of that metadata. *Compare* Gov't December 29, 2023 Opposition (ECF 16) at 3 ("According to an FBI report documenting the search warrant execution, law enforcement entered the defendant's residence at approximately 6:10 a.m. on March 16, 2022.") *with* Id. at 3 n. 3 ("Although the metadata in this first photograph

3

recorded the time as 5:16 a.m., the camera settings had not been adjusted for daylight savings time. The correct time of this photo is 6:16 a.m."); Id. at 4 n. 6 ("The metadata in this photograph recorded the time of this photo as 5:17 a.m. However, as described in footnotes four through six, the actual time is 6:17 a.m.") *and* Id. at 4 n. 9 ("Although the metadata in this photograph recorded the time as 6:20 a.m., the camera settings had not been adjusted for daylight savings time."). In the absence of affidavits from the potential witnesses, a hearing is required to resolve these factual disputes. See United States v. Messalas, No. 17-CR-339 (RRM), 2020 WL 4003604, at *8 (E.D.N.Y. July 14, 2020) ("the Court held a hearing for the parties to present evidence on whether agents exceeded the scope of the warrant…by entering Messalas's home before 6:00 a.m.); United States v. Davis, 2016 WL 953239 (D. Nevada 2016) (hearing required to resolve, *inter alia*, dispute over accuracy of metadata).

Illogically implying that it better corroborated the agents claim that they effected their entry after 6 a.m. than Jem Rankin's allegation that it commenced at 5:10, the Government points to a picture showing it to be dark at the time agents commenced breaking down the door. Ignoring the contradictory camera metadata and the unlikelihood that agents would have documented a willful violation of the warrant's temporal terms, the Government also invokes "[a]n FBI report drafted the next day [that] also corroborates the timing of the search warrant execution as 6:10 a.m. rather than at 5:00 a.m.," Opp. at 13, that it opted not to provide as an exhibit. Although their entry by battering ram, security sweep of three stories, detention of three other occupants and successful search of seven rooms must have preceded it, the Government also suggests that the agents' claim on their tape to be commencing *their interrogation* of Mr. Rankin at 6:13 a.m. corroborates the Government's unsworn argument that it did not commence execution of their warrant before 6 a.m. Opp. at 13 ("In real time, law enforcement agents recorded the conversation with the

4

defendant, noting the time and date of the search warrant execution.") While it may well have witnesses committed to saying so, the Court should order a hearing at which the Government's witnesses can do so under oath and subject to cross-examination.

Separately, the Government is completely mistaken in the recitation of the commencement date and time for daylight savings time in the year of 2022. Daylight savings time began March 13, 2022 at 2:00 AM, not March 12, 2023 at 3:00 AM as outlined in the Government's footnote #11 on page 14 in their brief.[1]

POINT II

WHERE AGENTS FAILED TO ISSUE *MIRANDA* WARNINGS AND REFUSED TO CEASE THEIR QUESTIONING AFTER MR. RANKIN STATED THAT HE WOULD RATHER NOT SPEAK WITH THEM, HIS STATEMENTS WERE CUSTODIAL AND COERCED AND MUST BE SUPPRESSED.

Statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights. Miranda v. Arizona, 384 U.S. 436, 444 (1966). The transcript establishes that Mr. Rankin was never so advised. Because the agents expressly questioned him about potentially incriminating activities, it likewise make clear that the questioning constituted an "interrogation". See Rhode Island v. Innis, 446 U.S. 291, 300–302 (1980) (defining interrogation as police "words or actions.. that they should have known were reasonably likely to elicit an incriminating response").

A.    The Standard For Determining Whether An Interrogation Is Custodial.

In determining whether a suspect was in custody, a court looks at all the surrounding circumstances. The relevant inquiry is "how a reasonable man in the suspect's position would

---

[1] See *Time Change 2022 in the United States* https://www.timeanddate.com/time/change/usa?year=2022 (Accessed: January 9, 2024, 4:24 PM)

have understood his situation." United States v. Faux, 828 F.3d 130, 134-135 (2d Cir. 2016) (quoting Berkemer v. McCarty, 468 U.S. 420 (1984)). The test for determining custody is an objective inquiry that asks (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." Id. (citations omitted).

Courts must eventually acknowledge that all of these characteristics are critical in determining how anyone reacts to an encounter with the police but, because the hypothetical "reasonable person" has no age, race or gender, the law has refused thus far to consider "an individual's subjective belief about his or her status" in the custody analysis. Faux, 828 F.3d at 135. Black people in general and young Black men in particular have ample reason to react more cynically or skeptically to police encounters than the general public and statistics demonstrate that they do. [2]

---

[2] See e.g. Gary Langer, *Confidence in police practices drops to a new low: POLL Just 39% are confident that the police are trained to avoid excessive force.* (February 3, 2023, 6:09 AM) ("Americans' confidence in how police are trained and their treatment of Black people both have fallen to new lows in an ABC News/Washington Post poll. Following the death of Tyre Nichols after he was beaten by Memphis police on Jan. 7, just 39 percent of adults in the national survey are confident that the police in this country are adequately trained to avoid the use of excessive force. And just 41 percent are confident the police treat Black and white people equally.") (https://abcnews.go.com/Politics/confidence-police-practices-drops-new-low-poll/story?id=96858308); M.C. Brown & Camille Lloyd, *Black Americans Less Confident, Satisfied With Local Police*, Social & Policy Issues (September 18, 2023).   (in a pattern that has remained consistent across three years of tracking, Black Americans' perceptions of policing in their communities remain substantially less positive than those of other U.S. adults. Black Americans' perceptions that their local police treat people like them fairly dipped to 54% in 2022. Similarly, Black Americans' views that police would treat them with courtesy and respect in an interaction (71%) continues to fall well below the national average (85%), as well as the percentages among Hispanic Americans (78%) and White Americans (90%).) (https://news.gallup.com/poll/511064/black-americans-less-confident-satisfied-local-police.aspx) (last visited January 8, 2024); Laura Santhanam, *Two-thirds Of Black Americans Don't Trust The Police To Treat Them Equally. Most White People Do* (June 5, 2020) ("Community trust in

Without disputing that he was startled awake in the pre-dawn hours by six White pistol-packing agents beating at the front door of the family home with a battering ram, that the agents promptly bum-rushed him, ordering him at gunpoint to back up against a wall or that three of them then ultimately singled him out and escorted him to a separate room for questioning, Jem Hazle Rankin November 26, 2023 Affidavit ("Jem Affidavit") at ¶¶ 1-3, 6-7, the Government argues that, because it was in his home and he was repeatedly assured that he was not then under arrest, the agents' interrogation of Mr. Rankin was noncustodial. Gov't Opp at 16.

Relevant considerations include: (1) "the interrogation's duration"; (2) "its location (e.g., at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether officers told the suspect he was free to leave or under suspicion." Faux, 828 F.3d at 135 (citations omitted). The weight of these individial factors notwithstanding, "[a]n individual who understands that her detention is "not likely to be temporary and brief" and feels that she is "completely at the mercy of police" could reasonably deem her situation comparable to formal arrest. Id. (citations omitted).

Mr. Rankin and his family experienced conduct that was far more frightening and coercive than that described in Faux, of which Judge Jacobs opined that "[t]he Government [had] stepped right up to the limits of constitutionally permissible conduct." Faux, 828 F.3d at 132. Investigating a White physical therapist who lived in suburban Connecticut home for Medicaid

---

law enforcement has eroded somewhat over the past few years, as police-involved killings of black people have come to national attention…. Nearly half of black Americanshave very little or no confidence thar police officers in their community treat people with different skin colors the same  (https://www.pbs.org/newshour/politics/two-thirds-of-black-americans-dont-trust-the-police-to-treat-them-equally-most-white-americans-do) (last visited January 8, 2024).

7

fraud, agents in <u>Faux</u> arrived in sunlight with guns holstered to find their targets loading a car in their driveway for a Mexican vacation. <u>Id</u>. at 132, 137 ("Nothing in the record suggests that Faux was suspected of being particularly dangerous; she was being investigated for a paperwork fraud scheme, and the warrant was to search primarily for documents rather than (for example) weapons or drugs.") Here, white agents investigating a young Black man living in a multifamily home in a marginal Brooklyn neighborhood for production of child pornography arrived in the pre-dawn hours with guns drawn and, rather than ring the bell, beat at the front door with a battering ram. In perhaps the most critical distinction, Faux was said to have volunteered information to the two suited agents who explained the purpose of their search. <u>Id</u>. at 133. Mr. Rankin, in contrast, complained to the three or four armed agents who had maneuvered him to a separate room that he knew not the reason for their raid and would prefer not to speak to them.

Conveniently recorded self-serving assurances notwithstanding, they having by then seized the phone they sought and ignored his stated preference to forego questioning, no reasonable person of any race would have believed that the six armed agents who effected their pre-dawn entry not by knocking but rather by employing a battering ram weren't going to arrest him whether or they not they were successful in persuading him to incriminate himself. That they detained him and his family at pistol point while running through the house surely extinguished any lingering doubts.

Recognizing that he was unlikely to acknowledge any interest or involvement in child pornography in his mother's presence, armed agents maneuvered Mr. Rankin to a private room for their three-on-one interrogation. Seeking to downplay the gravity of any choice to speak, agents proffered no consent form for his signature but rather sought oral agreement to speak.

> S1 02:48 Um, are you cool with talking to us for a little bit? We can sort this stuff out, or, uh, do you need to get out of here?

8

> S2 02:53 I mean, I need to get to work at by 8:30.
> S1 02:56 Okay.
> S2 02:56 So I usually leave here like 7:00.
> S1 02:57 All right. *If we talk for a few minutes, is that okay?*
> S2 03:00 *Yeah, I'd rather not,* but. S1 03:02 Well, you don't have to. I mean, we, we just wanna obviously go through this and obviously kind of let you know what we're doing here, what we're taking. *We obviously have some questions.*
> S2 03:09 Wait, you ha. you haven't told me what you're doing here yet, though. I don't understand.
> S1 03:13 Well, that's what we're getting into, but I want to make sure that you're okay. You're' cause you're not under arrest. I wanna make sure you understand that. Do you understand that?

When a suspicious Mr. Rankin withheld his consent, rather than respect his decisions, agents persisted, conceding that they "obviously had some questions for him".  In the Government's view, "no" should mean something less than no, and continued coercive coaxing is permissible.  Having been separated from his family each of whom were being detained elsewhere in the home and his phone having been seized as the focus of their search, there was no place to which Mr. Rankin could retreat and he had no cell phone to seek legal or other help.

Mr. Rankin's submission to police authority in such circumstances cannot objectively be called consensual speech.

B.  <u>Where, In Making Its Custody Determination, A Court Must Consider "All The Circumstances," There Is Enough Uncertainty Here About Some Of Them To Warrant A Hearing.</u>

While there is no dispute that the interrogation occurred in his home before he was handcuffed or that he resisted it, and the tape establishes the interrogation's duration and that the officers represented to Mr. Rankin, however unconvincingly, that, while he was under suspicion

9

of producing child porn[3], he was nevertheless free to leave, yet to be resolved are other potentially determinative circumstances, such as when and where agents drew their weapons, and to what end, how they isolated Mr. Rankin from his family, whether there was any unoccupied room to which he could have retreated to achieve solitude. See, e.g. Faux, 828 F.3d at 135-36 (quoting United States v. Craighead, 539 F.3d 1073, 1082–83 (9th Cir. 2008) (recognizing that, "[w]hen a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police–free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation"); United States v. Familetti, 878 F.3d 53, 60-62 (2d Cir. 2017) (same). The Court should therefor order a hearing.

---

[3] S1 04:29 Okay. So, um, here's the real the real scoop. Like, we're, we're, we're trying to be, um, I guess, quiet about this, cautious about this. 'Cause here's the thing. We *we we've known about since about a year, almost, maybe, that you bought some child porn* off some guys on Kik. Now, here's the thing. *We've known about it. What the concern is is whether or not you're raping kids. You're making you're producing child pornography. The FBI's main concern is is whether or not it's, it's to catch people who are producing child pornography. Making the material involving kids. Now, we don't know much about you other than some stuff. We don't know whether or not you're making it. So we're here to in part, to verify whether or not you're producing job pornography. We know about the stuff on Kik.*
S2 05:18 I can guarantee you. I promise you right now, I'm not making anything.

## CONCLUSION

For all of the foregoing reasons, Mr. Rankin requests that the Court issue an Order granting him the above-requested relief, or, alternatively, a hearing.

Dated: January 11, 2024

Respectfully submitted,

ROGER VICTOR ARCHIBALD, ESQ.
Attorney for Shakeem Rankin
26 Court Street Suite 711
Brooklyn, New York 11242
(718) 237-1111
brooklynatty@hotmail.com